# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

VIRGINIA B. DAVIS,

      **Plaintiff,**

    v.                                 **Case No.: 2:15-cv-2404**
                                              **JUDGE SMITH**
                                              **Magistrate Judge Vascura**

UNITED STATES OF AMERICA,

      **Defendant.**

## OPINION AND ORDER

This matter is before the Court upon the Motion for Partial Summary Judgment of Defendant United States of America (Doc. 21).  Plaintiff opposed Defendant's Motion (Doc. 22) and Defendants replied in support (Doc. 23).  This matter is now ripe for review.  For the following reasons, Defendant's Motion for Partial Summary Judgment is **GRANTED**.

## I.    BACKGROUND

This case stems from alleged medical malpractice against the United States, filed under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680.  Plaintiff claims that Dr. Cynthia Gray performed an unnecessary exploratory procedure that directly caused the miscarriage, or spontaneous abortion, of her pregnancy.  Dr. Gray is employed by Change, Inc., a federally funded community health center under the Federally Supported Health Centers Assistance Act, 42 U.S.C. § 233(g)–(n).

On December 2, 2013, Davis visited Change, Inc.'s clinic in Wintersville, Ohio for an ultrasound.  (Doc. 21-1, Stefanski Dep. at 32–33; Doc. 21-2, Russell Decl. at ¶ 4).  Davis was approximately four weeks pregnant at this time, but Davis mistakenly believed she was

approximately eight weeks pregnant and relayed this information to the ultrasound technician. (Doc. 21-1, Stefanski Dep. at 37, 39–40, 80–81). The ultrasound revealed no signs of an intrauterine pregnancy, which was alarming to the technician administering the ultrasound. (*Id.* at 37–38). Davis further reported either having pain in her left side or cramping similar to menstrual cramping. (*Id.* at 33; Doc. 21-3, Davis Dep. at 47–48). The ultrasound findings were reported to Dr. Kara O'Karma, who was the attending doctor in the clinic. (Doc. 21-1, Stefanski Dep. at 87–88). Dr. O'Karma reviewed the ultrasounds and sent Davis to Trinity Hospital in Steubenville, Ohio, for a possible ectopic pregnancy on the left side. (Doc. 21-4, Snodgrass Dep. at 40).

Dr. Gray performed a mini-laparotomy on Davis but found no evidence of an ectopic pregnancy. (Doc. 21-7, Gray Decl. at ¶ 2). This procedure requires a three to four centimeter incision through the abdominal wall and peritoneum to gain access to the pelvic cavity. (*Id.*). After the 20-minute procedure, Davis was doing well and was released to go home. (*Id.* at ¶ 4). Davis had to make a return trip to the hospital to address some urinary retention issues, which were resolved without any complications. (*Id.*). After experiencing some mild persisting pain, Davis returned to work approximately a week and a half after the procedure. (Doc. 21-3, Davis Dep. at 64).

In the weeks following Davis' procedure, embryonic development was monitored and found to be appropriate. Davis' hCG levels rose appropriately and a December 5 ultrasound (three days after the procedure) revealed that a gestational sac had developed in the uterus. (Doc. 21-6, Gray Dep. at 77, 90, 97). Another ultrasound was conducted on December 20 and, again, normal embryonic development was observed. (*Id.* at 99). The embryo had a normal heartbeat and measured at a gestational age of seven weeks and one day. (Doc. 21-2, Russell Decl. at ¶¶ 3,

6, 7).   Another ultrasound was conducted approximately five weeks after the procedure, on January 6.  Unfortunately, no heartbeat was detected and measurements reflected that the fetus stopped growing during the eighth week of Davis' pregnancy.  (*Id.* at ¶ 10).  A follow-up ultrasound on January 8 confirmed these findings.  (*Id.* at ¶ 11).  This was Davis' third and final pregnancy.  She had a child in 2004 and had a miscarriage a few years before the miscarriage at issue here.  (Doc. 21-9, Pl.'s Resp. to Def's. First Interrogs. at Resp. No. 1).  Davis experienced a history of infertility problems and underwent unsuccessful fertility treatment after her first miscarriage.  (Doc. 21-3, Davis Dep. at 73).  Davis' final potentially relevant health factor is that she had a thyroid abnormality during the pregnancy at issue.  (Doc. 21-9, Pl.'s Resp. to Def's. First Interrogs. at Resp. No. 4).

Plaintiff brought suit in this case under the FTCA, alleging that Dr. Gray's December 2, 2013 procedure constituted negligent medical malpractice that resulted in a miscarriage and injuries to Plaintiff.  Defendant now seeks summary judgment as to whether Dr. Gray's actions were the proximate cause of Plaintiff's miscarriage.

## II.   STANDARD OF REVIEW

Defendant moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient

evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id*. at 249-50.

The party seeking summary judgment shoulders the initial burden of presenting the court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury"). In considering the factual allegations and evidence presented in a motion for summary judgment, the Court must "afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Id*.

### III.   DISCUSSION

Defendant moved for partial summary judgment on the issue of whether the December 2nd procedure was the direct and proximate cause of Davis' miscarriage. Defendant's primary argument in support of granting partial summary judgment is that Plaintiff has not produced, nor can she produce, evidence "showing that it is more likely than not that Davis' spontaneous abortion directly resulted from the [procedure]." (Doc. 23, Reply at 2).

Plaintiff's claims are before this Court under the FTCA, which "does not *create* liability, it merely waives sovereign immunity to the extent that state-law would impose liability on a 'private individual in similar circumstances.'" *Mason v. United States*, No. 2:14-CV-853, 2016

WL 1594577, at *1 (S.D. Ohio Apr. 21, 2016) (Frost, J.) (citing *Myers v. United States*, 17 F.3d 890, 899 (6th Cir. 1994) (quoting 28 U.S.C. § 2674)) (emphasis in original). Further, "federal procedural law governs the manner in which [FTCA claims] are resolved on a summary judgment motion." *Vance By and Through Hammons v. United States*, 90 F.3d 1145, 1148 (6th Cir. 1996). Therefore, the Court will apply Ohio substantive law and federal procedural law "to determine whether a private person would be liable to Plaintiff under these circumstances." *Mason*, 2016 WL 1594577, at *1.

## A.     Admissibility of Plaintiff's Expert's Opinion Letters and Certificate of Merit

At the outset, the Court will briefly address Defendant's argument that the opinion letters of Dr. David Burkons, Plaintiff's medical expert, are inadmissible hearsay and cannot be considered by the Court at the summary judgment stage. Plaintiff also posits that Dr. Burkons' Certificate of Merit is inadmissible for the purposes of opposing summary judgment.

In support of its position with respect to the opinion letters, Defendant cites several Sixth Circuit cases that applied Federal Rule of Civil Procedure 56 as it existed prior to the significant 2010 amendments of that rule. In *Shaffer v. CSX Transp., Inc.*, 462 F. App'x 597, 602 fn. 2 (6th Cir. 2012), the Sixth Circuit ruled that the district court did not commit error by refusing to consider an unsworn expert report submitted by a nonmoving party opposing summary judgment. In coming to this conclusion, the Sixth Circuit relied on its earlier holdings in *Sigler v. Am. Honda Motor Co.,* 532 F.3d 469 (6th Cir. 2008) and *Pack v. Damon Corp.*, 434 F.3d 810 (6th Cir. 2006). In *Sigler*, the movant submitted three unsworn expert reports in support of its motion for summary judgment. The court ruled that "the district court improperly considered Honda's unsworn, hearsay evidence in deciding to grant Honda's motion for summary judgment." *Sigler*, 532 F.3d at 481. Similarly, in *Pack*, the court held that the district court erred by relying on the summary judgment movant's unsworn expert report. *Pack*, 434 F.3d at 815.

On the flip side of that argument, Defendant also noted a decision from the Eastern District of Michigan which concluded that unsworn expert reports submitted by a nonmoving party (as is the present case) may be considered at the summary judgment stage. That court reasoned:

> Plaintiff has objected to the R & R's finding that Dr. Bacon's expert report is inadmissible. Generally, a court may not consider inadmissible evidence on a motion for summary judgment. *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007). However, a non-moving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *cf.* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence." (emphasis added)). The relevant inquiry is whether the evidence submitted in non-admissible form during the summary judgment stage "will be reduced to admissible form at trial." *DeBiasi v. Charter Cty. of Wayne*, 537 F. Supp. 2d 903, 911 (E.D. Mich. 2008) (quoting *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996)); *see* 11 James W. Moore et al., *Moore's Federal Practice* § 56.91[2], [3] (3d ed. 1999) (discussing inadmissible content versus inadmissible form).
>
> [ . . .]
>
> The R & R, as well as Defendants Hutchinson and Mamidipaka, cite to *Sigler v. American Honda Motor Co.*, 532 F.3d 469 (6th Cir.2008), for the proposition that an unsworn expert report is hearsay and thus inadmissible. However, *Sigler* is inapplicable because there, it was the moving party that offered the unsworn expert reports in support of its motion for summary judgment. Here, Plaintiff, the non-moving party, is offering an unsworn expert report in opposition to Defendants' motion for summary judgment. Thus, *Celotex*'s more lenient standard for non-moving parties applies. *See Celotex*, 477 U.S. at 324. In addition, since *Sigler*, Rule 56 has been substantially amended and revised, and subdivision (e) of the former Rule 56, which governed the admissibility of evidence for purposes of summary judgment, has been largely omitted. *See, e.g.,* Fed. R. Civ. P. 56 advisory committee notes, 2010 amendments, subdivision (c) ("Subdivision (c) is new. . . . Subdivision (c)(4) carries forward some of the provisions of former subdivision (e)(1). Other provisions are relocated or omitted.").

*Allen v. Shawney*, No. 11-10942, 2014 WL 1089618, at *9–10 (E.D. Mich. Mar. 18, 2014), *aff'd* (6th Cir. No. 14-1510 (June 3, 2015)).

The Court finds the *Allen* approach appropriate under the circumstances. While it is true that Dr. Burkons' opinion letters are unsworn and would be inadmissible at trial in their present form, Defendant does not argue that the letters are incapable of being presented in admissible form, as is currently required under Rule 56. ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2)). Because the content of Dr. Burkons' opinion letters is fully capable of being reduced to admissible form, the Court finds them proper for consideration.

The Court now turns to the Dr. Burkons' sworn Certificate of Merit as possible evidence in opposition to summary judgment. An "affidavit of merit"—or "certificate of merit," in this case—is a short statement attached to a medical malpractice complaint required by Ohio Rule of Civil Procedure 10(D)(2). "[T]he purpose of the affidavit of merit is to establish the adequacy of the complaint and thus deter the filing of frivolous medical-malpractice claims." *Troyer v. Janis*, 132 Ohio St. 3d 229, 2012-Ohio-2406, 971 N.E.2d 862, ¶ 7 (citing *Fletcher v. Univ. Hosps. of Cleveland*, 120 Ohio St. 3d 167, 2008-Ohio-5379, 897 N.E.2d 147, ¶ 10). As a matter of law, the affidavit of merit requirement is state substantive law. *See Willis v. U.S., Dep't of Veteran's Affairs*, No. 2:12-CV-867, 2013 WL 3155785, at *3 (S.D. Ohio June 20, 2013) (Graham, J.) ("it is well-established that the affidavit requirement is substantive in nature . . . .") (citing cases). Rule 10(D)(2) requires the affidavit of merit to state the following:

(i)     that the affiant has reviewed all medical records reasonably available to the plaintiff concerning the allegations contained in the complaint;

(ii)    (ii) that the affiant is familiar with the applicable standard of care; and

(iii)   (iii) the opinion of the affiant that the standard of care was breached by one or more of the defendants and that the breach caused injury to the plaintiff.

Ohio Civ. R. 10(D)(2)(a)(i)–(iii).  Further, Rule 10(D)(2)(d) states that "[a]n affidavit of merit is required to establish the adequacy of the complaint and **shall not otherwise be admissible as evidence** or used for purposes of impeachment."  (emphasis added).

Even if Rule 10(D)(2)(d) is not to be construed as a blanket prohibition on using an affidavit of merit as evidence to oppose summary judgment, there is considerable Ohio case law that stands for the proposition that affidavits of merit containing "only the bare assertions required by Civ. R. 10(D)(2)(a) can never constitute evidence of the type enunciated in Civ. R. 56(C) to support or oppose a motion for summary judgment."  *White v. Summa Health Sys.*, 9th Dist. Summit No. 24283, 2008-Ohio-6790, ¶ 22; *see also Braden v. Sinar*, 9th Dist. Summit No. 24056, 2008-Ohio-4330, ¶ 20; *Schura v. Marymount Hosp.,* 8th Dist. No. 94359, 2010–Ohio–5246, ¶ 28 ("The affidavits of merit in this case contain only the bare assertions required by Civ.R. 10(D)(2).  As such, they are insufficient to oppose summary judgment."); *Babcock v. Albrecht*, 11th Dist. Lake No. 2010–L–150, 2012-Ohio-1129, ¶ 44 (disregarding affidavit of merit on summary judgment where no facts were set forth regarding the prevailing standard of care, how that standard of care was not met, or how the alleged breach caused the injury at issue).

Here, like the cases cited in the paragraph above, Dr. Burkons' Certificate of Merit fails to set forth any additional facts above and beyond the bare assertions required by Civ. R. 10(D)(2).  Accordingly, this Court will not consider these statements at this stage of the litigation.

**B.     Causation**

"In order to establish medical malpractice, the plaintiff must prove by a preponderance of the evidence that the injury complained of was proximately caused by medical care or treatment that fell below the recognized standards of medical care in the community."  *Kester v. Brakel*,

10th Dist. Franklin No. 06AP-253, 2007-Ohio-495, ¶ 26 (citing *Bruni v. Tatsumi*, 46 Ohio St. 2d 127, 131–32 (1976)). "Proximate cause is 'a happening or event which as a natural and continuous sequence produces an injury without which the result would not have occurred.'" *Hitch v. Ohio Dep't of Mental Health*, 114 Ohio App. 3d 229, 240, 683 N.E.2d 38 (10th Dist. 1996) (quoting *Randall v. Mihm*, 84 Ohio App. 3d 402, 406, 616 N.E.2d 1171 (2nd Dist. 1992)). In general, the plaintiff in a medical malpractice case "must prove causation through medical expert testimony in terms of probability to establish that the injury was, more likely than not, caused by the defendant's negligence." *Roberts v. Ohio Permanente Med. Grp., Inc.*, 76 Ohio St. 3d 483, 485, 668 N.E.2d 480 (1996) (citing *Shumaker v. Oliver B. Cannon & Sons, Inc.*, 28 Ohio St.3d 367, 369, 504 N.E.2d 44 (1986)).

Here, Plaintiff is faced with the difficult task of showing that it was more likely than not that the procedure she underwent on December 2, 2013, was the proximate cause of the miscarriage she suffered approximately four weeks later. The Court refers to this task as "difficult" because, as Defendant points out, "[t]he law and the medical literature have long confirmed the lay understanding that spontaneous abortion is common and has many different causes such that cause in any particular case is usually unknown." (Doc. 21, Mot. at 10 (citing Lesley Regan et al., *Influence of Past Reproductive Performance on Risk of Spontaneous Abortion*, 299 Brit. Med. J. 541, 541 (1989), attached to Doc. 21-8, Griffin Dep. at Ex. 3)).

Defendant's medical expert, Dr. Larry Griffin, submitted an eight-page report, a full page and a half of which was devoted to the issue of causation. (Doc. 21-8, Griffin Dep. at Ex. 2). Dr. Griffin cited to several pieces of medical literature and discussed the expected harm that would occur (fetal demise within a matter of days) if the procedure was a significant insult to the pregnancy. Instead, Dr. Griffin noted that Plaintiff's hCG levels rose appropriately, an

9

intrauterine gestational sac containing a fetal pole developed, and normal fetal cardiac activity was observed. Dr. Griffin reasoned—and noted that other teratologists share the same opinion— that an insult occurring so early in pregnancy will either cause cell death to a degree incompatible with further fetal development or no harm at all because of the low number of overall cells and the rapid rate of cell division during this early period of development. This evidence sufficiently demonstrates the absence of a genuine issue of material fact.

As a result of Defendant's showing, the burden of proof shifts to Plaintiff to prove that a genuine issue of material fact exists. Consistent with the medical malpractice standards set forth above, Plaintiff must make this showing through medical expert testimony that establishes that the injury was, more likely than not, caused by the defendant's negligence. In attempting to do so, Plaintiff relies on three opinion letters from Dr. Burkons. The majority of the opinion letters' content is related to the actual care Plaintiff received. These facts have been sufficiently set forth above and do not bear repeating here. However, a brief summary of each letter, to the extent each deals with the issue of causation, is warranted.

The first letter, dated May 31, 2016, generally states that Dr. Burkons has reviewed the relevant materials and notes that he has practiced obstetrics and gynecology since 1973 and has "evaluated literally hundreds of patients for the possibility of ectopic pregnancy and have treated ectopics on many occasions," (Doc. 22-3, Burkons 1st Op. Ltr. at 1). Dr. Burkons further opines that "[d]uring the operation, it is clear that there must have been manipulation of the uterine fundus . . . ." (*Id.* at 2). Without stating any further basis for his opinion, Dr. Burkons later concludes, "[a]s a viable intrauterine pregnancy develops, and then became non-viable, it is my opinion, to a high degree of medical probability, that the trauma of the surgery and the anesthesia

involved, was the proximate cause of this viable pregnancy not continuing to a normal delivery." (*Id.* at 3).

The second letter, dated June 15, 2016, is largely silent as to causation with the exception that Dr. Burkons concludes, "[t]hus, after reviewing the above mentioned depositions, my opinion regarding deviation from the standard of care and their impact on Mrs. Davis' preganancy and subsequent psychological problems, are not only confirmed, but strengthened." (Doc. 22-4, Burkons 2d. Op. Ltr. at 2).

The third and final letter, dated August 17, 2016, was issued by Dr. Burkons as a rebuttal to Defendant's expert report and contains the most causation-related statements of any of the three letters. Dr. Burkons opined that his opinion was indeed strengthened by one of the medical articles relied upon by Dr. Griffin. Dr. Burkons cited the following sentence from that article's conclusion: "A false positive diagnosis of a non-viable pregnancy early in the first trimester— incorrectly diagnosing pregnancy failure in a woman with intrauterine gestational sac or ruling out viable intrauterine gestation in a woman with a pregnancy of unknown location—can prompt interventions that damages a pregnancy that might have had a normal outcome." (Doc. 22-5, Burkons 3d Op. Ltr. at 1). Dr. Burkons concluded, "[t]his is exactly what happened in this case." Later in his third opinion letter, Dr. Burkons' attempts to establish a nexus between his substantial experience in performing similar procedures throughout his medical career and the procedure presently at issue. He states that in his experience, these procedures "involved excessive manipulation of the uterus, tubes an ovaries" and the same "would have to have been done in Mrs. Davis' case." Dr. Burkons continued, "In these cases, there is ample opportunity to partially disrupt the corpus luteum on the ovary and the implementation of the fetus in the uterus

which **can** result in sub optimum development of the pregnancy and fetal demise." (*Id.* at 2 (emphasis added)).

"It is well settled that a Rule 26(a)(2)(B) expert report 'must set forth facts and, in doing so, outline a line of reasoning arising from a logical foundation.'" *Express Energy Servs. Operating, L.P. v. Hall Drilling, LLC*, No. 2:14-CV-204, 2015 WL 3743795, at *5 (S.D. Ohio June 15, 2015) (Frost, J.) (quoting *R.C. Olmstead, Inc. v. CU Interface, LLC,* 606 F.3d 262, 271 (6th Cir. 2010)) (additional internal quotations omitted). Further, there is no requirement that a district court "'admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). The Sixth Circuit has stated on multiple occasions that expert reports "must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 521 (6th Cir. 2014) (quoting *R.C. Olmstead*, 606 F.3d at 271). Stated another way, "[c]onclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Alexander*, 576 F.3d at 560 (citing *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "If a court concludes that the evidence supporting the expert's position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, then the court remains free to prohibit the case from proceeding to the jury." *Glaser v. Thompson Medical Co.*, 32 F.3d 969, 972 (6th Cir. 1994) (citing *Daubert v. Merrell Dow Pharm., Inc.,* 113 S. Ct. 2786, 2798 (1993)). "Although courts should be careful to respect scientific opinion, nevertheless courts apply a 'hard look' to the reasoning of qualified scientific opinions to determine whether a triable issue has been

created." *Austin v. Children's Hosp. Med. Ctr.*, 92 F.3d 1185, 1996 WL 422484, at \*2 (6th Cir. 1996) (citing *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1252–53 (6th Cir. 1992)).

Defendant argues that Dr. Burkons failed to provide "how" and "why" he reached his conclusion because he has not cited to any medical literature and that his statements are speculative and conclusory. While the Court is aware of Dr. Burkons' failure to cite to any medical literature to support his position, this omission alone does not necessarily render his opinion meritless. The Court's greater concern lies with Plaintiff's argument that Dr. Burkons' provided "how" and "why" he reached his conclusions by virtue of the fact that he has extensive personal experience on the subject. While the Court has no reason to question the competency of Dr. Burkons as a surgeon, the Court does not agree with Plaintiff's position. Dr. Burkons' extensive experience certainly speaks to his exposure to ectopic pregnancy-related procedures, but the Court cannot rely on that information alone. His letters do not provide any facts explaining how or why his personal experiences led him to his conclusions under this particular set of facts. All that remains are conclusory statements that leave the Court to wonder how Dr. Burkons' experience with ectopic pregnancies is applicable to the specific issue of causation. Dr. Burkons stated that he performed procedures to rule out ectopic procedures "many, many times" but his letters do not inform the Court of how these cases resulted (e.g., how many, if any, of these procedures ultimately led to miscarriage and how long after the procedures the miscarriages occurred). Dr. Burkons also failed to address "how" and "why" Dr. Griffin's opinions pertaining to Plaintiff's normal rise in hCG levels, appropriate fetal development, normal fetal heart rate, Plaintiff's past infertility issues, Plaintiff's past miscarriage, or Plaintiff's thyroid abnormality during the pregnancy ultimately did not affect his conclusion that the December 2nd procedure was more likely than not the cause of Plaintiffs miscarriage. *Cf. Austin*,

1996 WL 422484 at *2 (finding insufficiency of expert testimony in part because the expert did not "explain why he excluded the myriad of other potential sources of the [alleged harm]). If Plaintiff is going to rely on the personal experience of its expert, these facts are critical to establish a nexus between Dr. Burkons' experience and the present case. Without these facts, the Court would be relying solely on *ipse dixit* of Dr. Burkons.

Nor is the Court persuaded by Dr. Burkons' multiple claims that the medical literature relied upon by Dr. Griffin in fact bolsters his opinion that the procedure was the proximate cause of Plaintiff's miscarriage. Each of the articles contains variables or elements that render them inapposite with the propositions that Dr. Burkons contends they stand for. Further, Plaintiff points out that "neither [expert] could identify a controlled study, let alone one that was random and double blinded, to determine the cause and effect, if any between surgery and miscarriage[]" and "there are no controlled studies available to assist the parties' medical experts or the fact finder [sic] determine whether the subject surgery caused Plaintiff's miscarriage." (Doc. 22, Resp. at 5, 6). These arguments are not availing to Plaintiff. If anything, they underscore the difficulty of the evidentiary hurdle that Plaintiff is faced with in opposing summary judgment. Finally, Plaintiff argues that Dr. Griffin "cannot rule out with 100% certainty that there is a link between surgery and miscarriage." Given the uncertain nature of miscarriages, this position should come as no surprise to Plaintiff. Of course, it is not Defendant's burden to rule out a causal link with 100% certainty. Rather, Plaintiff bears the burden of proof to show that it is more likely than not that the December 2nd procedure was the proximate cause of Plaintiff's miscarriage.

In sum, the expert medical testimony relied upon by Plaintiff fails to raise a genuine issue of material fact because Dr. Burkons' opinion letters fail to state the "how" and "why" it is more

likely than not that the December 2nd procedure was the proximate cause of Plaintiff's miscarriage.  Plaintiff asks this Court to give great weight to factually unsupported speculation, conclusory statements, and *ipse dixit*.  While it is possible that the December 2nd procedure may have led to Plaintiff's miscarriage, this mere possibility—in the absence of evidence showing that a jury could find was more likely than not—is not enough for Plaintiff to avoid summary judgment.  Accordingly, Defendant's Motion for Partial Summary Judgment is **GRANTED**.

## IV.    CONCLUSION

Based on the foregoing, Defendant's Motion for Partial Summary Judgment is **GRANTED**.  The Clerk shall **REMOVE** Document 21 from the Court's pending motions list.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**